SO ORDERED: September 30, 2014.



James M. Carr
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| IN RE: ) | |
| ) | |
| HERBERT DEAN ELLETT, III and ) | Case No. 13-06304-JMC-7 |
| TONA MARIE ELLETT, ) | |
| ) | |
| Debtors. ) | |
| _____) | |

ORDER GRANTING AMENDED MOTION TO HOLD CREDITOR
SOUTH EMERSON SURGERY CENTER IN CONTEMPT
FOR VIOLATION OF U.S. BANKRUPTCY LAWS

THIS MATTER comes before the Court on the Amended Motion To Hold Creditor South Emerson Surgery Center In Contempt For Violation Of U.S. Bankruptcy Laws filed by Tona Ellett[1] on December 13, 2013 (Docket No. 27) (the "Motion") and South Emerson Surgery Center's Verified Response Debtors' Amended Motion To Hold Creditor Franciscan Alliance, Inc. In Contempt For Violation Of U.S. Bankruptcy Laws [sic] filed by South Emerson Surgery

---

[1] At the Hearing, it was clarified that Herbert Ellett ("Herbert") is the account debtor with respect to services provided by South Emerson Surgery Center. Thus, the Court deems the Motion to have been filed by Herbert.

Center ("SESC") on February 12, 2014 (Docket No. 49) (the "Response"). The Court, having reviewed the Motion, the Response, Debtor's Trial Brief filed by Herbert and Tona Ellett (collectively, the "Debtors") on May 15, 2014 (Docket No. 75), Debtors' Brief On The Issue Of Attorneys' Fees filed on June 5, 2014 (Docket No. 80), and South Emerson Surgery Center's Post-Trial Brief filed on June 6, 2014 (Docket No. 83) (the "Post-Trial Brief"); having considered the evidence admitted and the arguments of counsel made at a hearing on May 22, 2014 (the "Hearing"); and being otherwise duly advised, now **GRANTS** the Motion.

Jurisdiction and Venue

The Court has jurisdiction in this matter pursuant to 28 U.S.C. §§ 157(a), 157(b)(1) and 1334, and the General Order of Reference issued by the United States District Court for the Southern District of Indiana on July 11, 1984. Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

Findings of Fact

The Court makes the following findings of fact:

*Bankruptcy Case*

1.　On June 13, 2013 (the "Petition Date"), Debtors filed a voluntary petition under Chapter 7 of the United States Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"),[2] in the United States Bankruptcy Court for the Southern District of Indiana, Indianapolis Division.

2.　On June 14, 2013, the Clerk issued a "Notice of Chapter 7 Bankruptcy Case, Meeting of Creditors and Deadlines" (the "Notice"). (Docket No. 10.) The Notice was sent to SESC at 8141 South Emerson Avenue, Suite C, Indianapolis, IN 46237-8584 and 1515 West

---

[2]　All statutory references herein are to the Bankruptcy Code unless otherwise noted.

Dragoon Trail, Mishawaka, Indiana 46544-4710 by first class mail on June 16, 2013, according to the Certificate of Notice filed by the Bankruptcy Noticing Center. (Docket No. 11; Ex. 1.)

3.  On October 1, 2013, Debtors received their general discharge. (Docket No. 16; Ex. 2.) The "Discharge of Debtors in a Chapter 7 Case" was sent to SESC at the same addresses by first class mail on October 3, 2013, according to the Certificate of Notice filed by the Bankruptcy Noticing Center. (Docket No. 18.)

4.  On October 1, 2013, Debtors' bankruptcy case was closed. (Docket No. 17.)

5.  On November 21, 2013, Debtors moved to reopen their case so they could pursue stay/discharge violations against certain creditors. (Docket No. 20.) That motion was granted, and on November 25, 2013, the bankruptcy case was reopened. (Docket No. 22.)

*Medical Services/Billing Statements*

6.  On June 7, 2012 and June 21, 2012, Herbert met with T. Lee, M.D. to receive medical services, and on November 20, 2012, Herbert met with G. Hardin, M.D. to receive medical services. (Ex. 6.)

7.  On July 16, 2013 and September 4, 2013, SESC sent billing statements to Herbert in the amount of $9,892.18 and $10,038.36, respectively,[3] for the medical services provided and/or service charges incurred. (Exs. 6 and 8.) An $899 debt to SESC was scheduled by Debtors. (Schedule F, Docket No. 1.)

8.  Debtors' counsel, John T. Steinkamp ("Counsel"), sent a letter dated July 26, 2013 (the "Demand Letter") to SESC (a) advising it that the automatic stay that arose when Debtors filed their bankruptcy case prohibits any and all collection activities, and (b) demanding that SESC cease all collection activities. (Ex. 7.)

---

[3] The difference between the amounts on the two billing statements is attributable to the addition of two $73.09 service charges.

9.  Herbert testified that he felt stress about having received the billing statements, but he incurred no expenses related to such stress. His out-of-pocket expenses include fuel costs of approximately $100. He further estimates that he has spent 14-15 hours away from work ($25/hour) dealing with this matter, though he was not working in the 2-3 weeks leading up to the Hearing.[4]

10. Herbert incurred attorneys' fees in connection with pursuing the Motion. Counsel submitted an affidavit of attorneys' fees and expenses in the amount of $2,612.50 through May 18, 2014. (Ex. 9.) It does not include time spent preparing for or participating in the Hearing, nor for time spent on post-Hearing briefing.

11. Kimberly Foote, SESC's practice administrator, testified at the Hearing that:

   a. SESC received the Notice on or about July 8, 2013. The Notice was forwarded to SESC by Eagle Accounts (a collection agent for SESC).

   b. Ms. Foote does not believe SESC received the Demand Letter because the Demand Letter was not located in its file.

   c. Herbert received "professional services" and "ancillary services" from SESC. A claim was made to United Healthcare (Herbert's insurance company) for both services. At the time SESC sent the billing statements to Herbert, the insurance company had paid the professional-services claim but had "pended" (or not paid) the ancillary-services claim related to a particular diagnosis. Because the "pended" insurance claim resulted in an unpaid balance on Herbert's account, SESC's automated system generated the billing statements Herbert received.

   d. The only way for SESC to stop the billing statements from going to

---

[4] At the Hearing, three contempt motions came before the Court, two of which were brought by Herbert (including the Motion). The Court views Herbert's testimony regarding the out-of-pocket expenses he incurred as collective, meaning that they are his total expenses for both motions, not just the Motion.

Herbert was to "zero out" the account. However, even after receiving the Notice, SESC did not "zero out" the account or write off the "pended" balance because if it had, there would not have been a claim to "be worked" with (or a balance to be paid by) the insurance company. SESC's computer system would not permit it to write-off and then reinstate such claim, nor would its computer system allow SESC to process an insurance claim without sending a billing statement to the patient.

  e. All other claims (e.g., where an insurance claim was not pending or where there was a balance due from Herbert after the insurance proceeds had been credited to the account) were written off. SESC did not believe that Herbert owed the balances reflected on the July 16, 2013 and September 4, 2013 billing statements, but there was nothing on the billing statements indicating that Herbert should not pay them.

  f. Ms. Foote knew that once the Notice was received, all contact with Herbert was supposed to have stopped.

  g. The insurance claim continues to pend, with a final appeal of the denial of the claim finalized in August 2013. SESC took other, unidentified steps to make sure no further billing statements were or are sent to Herbert.

  h. Rather than make adjustments to the automated system to stop billing statements from being sent to debtors in bankruptcy cases, Ms. Foote says SESC might "zero out" account balances in the future and see if the insurance companies will respond to the claim. She also thinks it might be possible to put a disclaimer on the billing statements before they are sent to debtors, just as SESC does for patients who are to contact their insurance companies regarding possible pre-existing conditions.

12. Despite SESC's belief that Herbert did not owe the balances reflected on the

billing statements, there is nothing on the billing statements indicating that Herbert should not pay them.

13. No further collection activity occurred after SESC sent the September 4, 2013 billing statement.

Conclusions of Law

The Court makes the following conclusions of law:

14. Any finding of fact above will also be a conclusion of law, and any conclusion of law will also be a finding of fact to support the decision of the Court.

*Violation of the Automatic Stay: 11 U.S.C. § 362(k)*

15. Herbert alleges that the billing statements violate the automatic stay.[5] The Court agrees.

16. The relevant portion of § 362(k) provides:

> (1) Except as provided in paragraph (2), an individual injured by any willful violation of a stay provided by this section shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages.

To succeed on his § 362(k) claim, Herbert has the burden of establishing the following elements by a preponderance of the evidence:

> (1) a bankruptcy petition was filed; (2) the aggrieved debtor is an "individual"; (3) the creditor had notice of the petition; (4) the creditor's actions were willful and violated the stay; and (5) the debtor is entitled to a form of relief provided by § 362(k).

Ralph v. Forum Credit Union (In re Ralph), 2010 WL 2594947 at *3 (Bankr. S.D. Ind. 2010) (citing Galmore v. Dykstra (In re Galmore), 390 B.R. 901, 907 (Bankr. N.D. Ind. 2008)). "For the violation to be 'willful', the creditor need only intend to commit the act that led to the

---

[5] While the Motion alleges violations of both the automatic stay and the discharge injunction, the billing statements in question were sent between the Petition Date and the date Debtors received their discharge. Therefore, the Court will only address whether sending the billing statements violated the automatic stay.

violation; the debtor need not prove that the creditor specifically intended to violate the stay." Id. (citing Galmore, 390 B.R. at 907; Kline v. Tiedemann (In re Kline), 424 B.R. 516, 524 (Bankr. D. N.M. 2010)).

17. The first and second elements are uncontested.

18. SESC contests the third element and argues that "Debtors have failed to demonstrate that any of the [billing statements] were sent by [SESC] after it had notice of the bankruptcy." (Post-Trial Brief, p. 3.) The Court disagrees. The third element is established by the evidence that SESC received the Notice on July 8, 2013, which was before SESC sent the July 16, 2013 and September 4, 2013 billing statements. SESC's arguments based on lack of notice, and therefore related arguments that any violation was merely "technical" because SESC did not have notice (Post-Trial Brief, pp. 3-4), fail because the evidence shows otherwise. SESC goes on to argue that the July 16, 2013 billing statement was generated *prior to* the time SESC "had notice [of Debtors' bankruptcy case] and had an opportunity to update its systems to ensure that no further collection activities occurred." (Post-Trial Brief, p. 3.) This argument fails as a factual matter because there is no evidence in the record that SESC did not have time after receiving the Notice on July 8, 2013 to stop the system from sending the July 16, 2013 billing statement (that is to say, Ms. Foote did not so testify). Moreover, the period between July 8, 2013 and September 4, 2013 presumably provided "an opportunity to update its systems to ensure that no further collection activities occurred," and yet the September 4, 2013 billing statement was still sent.

19. SESC also contests the fourth element and argues that its actions were not willful. (Post-Trial Brief, pp. 3-6.) The Court disagrees. There is no dispute that the billing statements were sent by SESC's automated system. SESC may not have specifically intended to violate the

automatic stay, but it did "intend to commit the act that led to the violation" (as described in Ralph) by causing billing statements to be sent to Herbert. Ms. Foote testified that, even though she knew all contact with Herbert was supposed to have stopped, SESC did not zero out or write off that portion of Herbert's account subject to the pending insurance claim so it could work the insurance claim. The result of that decision was SESC's sending the July 16, 2013 and September 4, 2013 billing statements with knowledge of the automatic stay. Based on these facts, the Court concludes that SESC's actions were willful under the standard described in ¶ 16 above.

20. The Court further concludes that the fifth element is satisfied. Herbert's testimony as to his out-of-pocket expenses and lost wages was questioned by SESC, but controverting evidence was not presented. Therefore, the Court awards Herbert actual damages in the amount of $225.[6]

21. The Court will also award reasonable attorneys' fees to Herbert. Viewing the totality of the evidence, including the total amount of the debt, the number and dates of the violations of the automatic stay, the circumstances under which the billing statements were sent, SESC's knowledge that contact with Herbert was supposed to have stopped after his bankruptcy petition was filed, when SESC stopped sending billing statements to Herbert vis-à-vis the date it received the Notice, the uncertainty surrounding the actions SESC had taken or will take to ensure billing statements are not sent to debtors in the future, and Counsel's fee affidavit, the Court concludes that reasonable attorneys' fees for this matter are $2,000. Therefore, the Court awards Herbert attorneys' fees in the amount of $2,000 and expenses in the amount of $20.

---

[6] This amount is calculated by adding $350 for missed work time and $100 for gasoline and dividing it by 2.

<u>Decision</u>

Based on the foregoing, the Court hereby GRANTS the Motion.

Pursuant to 11 U.S.C. § 362(k)(1), the Court awards to Herbert $2,245 in actual damages, consisting of $225 in out-of-pocket expenses and lost wages, attorneys' fees in the amount of $2,000, and expenses in the amount of $20.

The Court does not award punitive damages to Herbert.

SESC shall pay the total award of $2,245 to Herbert by October 31, 2014.

IT IS SO ORDERED.

# # #